Again, my name is Jay O'Howe from the Arkansas Attorney General's Office, and I am here in this case on behalf of the appellant, Lt. Jacob King. And I just spoke with my friend, Mr. Donovan, a moment ago, and we have both just realized that there is a misstatement in the briefs as to the procedural posture of one of the cases that we both cite. It's Williams v. Horner, 403 Fed APBX 138. On page 3 of the opening brief, I erroneously stated that that case was a reversal of a denial of qualified immunity. And on page 12 of the responsive brief, the appellee characterized that as a reversal of summary judgment in favor of defendants. Actually, the case was a reversal of a dismissal on screening under 1915A. So I just wanted to clear that point before we move forward. But I'll contend that the procedural posture doesn't change the reason for our citation of that case, and I'll explain that more here in a bit. Now, hopefully you have something better than a separate opinion in an unpublished decision, though. We're going to try to work into that. Yes, sir. Now, in the complaint, in the addendum at page 2 and the appendix at page 14, under the heading that the inmate gave it as provoking altercation, he states that on October 19, 2010, that Mr. King and a major at the department were making rounds in the isolation housing unit where Mr. Reeves was assigned. And the inmate was not happy because apparently some of the guards in the unit were not accepting and processing grievances as he felt they should have been. The first step in the grievance procedure at the Department of Correction is to present one to someone of the rank of at least sergeant or above. In response to that verbal complaint, the complaint says that Lieutenant King said, Reeves, go ahead and snitch to the major like you did to him on the nurse and he'll get back to you. That is, according to the complaint, the only claim that is against Lieutenant King. Now, the plaintiff in the case, he filed or initiated a grievance that day and he eventually exhausted that grievance. The very next day, he was moved from that isolation housing unit to a separate prison. There are no allegations of any intimidation or threats or an altercation of any sort while he was still at that unit. And if I may, to make a long procedural history short, Lieutenant King and the other defendants filed several dispositive motions arguing that he was entitled to qualified immunity on the failure to protect claim and the Western District denied qualified immunity in this case. And that is why we're here on an interlocutory appeal. Now, in Farver v. Brennan, the court laid the framework for analyzing failure to protect claims under the Eighth Amendment. They said that there's both an objective and a subjective component. Objectively, there has to be proof of a substantial risk of a serious harm. On the subjective side, the court made it clear that the officer has to be deliberately indifferent to that risk. That is, he has to actually perceive that serious risk of harm and then choose to ignore it. Moving towards the line of snitch cases, the first one that this court has really on point is the Irving v. Dormier case. Now, the facts from this are drastically different from Irving. In that case, it was undisputed that there were several guards who were on, I think it's fair to say, a campaign of terror against this inmate. They were trying to get him to dismiss a case that he had filed against a fellow correctional officer. The one guard in particular who was alleged to have falsely labeled inmate Irving as a snitch didn't just do that. On at least three different occasions, he propositioned other inmates trying to solicit attacks. He offered them cigarettes. He offered them money. There was already an instance where some of the other defendants in that case had opened up a locked cell door so that another inmate could actually go in and attack that inmate. In that case, the guard who had falsely labeled him as a snitch also handed a razor blade to another inmate, again trying to solicit harm against that person. The inmate made a complaint, and the guard quickly went in, took out the razor, but it wasn't disputed in that case that he actually did give a razor to an inmate. The cases that address this afterwards make it clear that in that instance, he falsely labeled that inmate as a snitch, one who reports on other inmates in an attempt to incite violence against him. Now, we argue that the facts in the Norman Schutzel case are much more in line with what we actually have going on here. In that case, a guard was responsible for running one of the corrections programs. It had to do with hospitality and restaurant management. The plaintiff in that case believed that there was some mismanagement within the program. There was misuse of state funds, so he filed a grievance. As it turns out, in that case, the grievances were called kites. At the Arkansas Department of Corrections, kites are unauthorized inmate communications, secret notes that inmates pass back and forth. So kind of in our general theme of the context matters, in the Arkansas Department of Corrections, if an officer had shown other inmates a kite, that's a note from one inmate to another that had sensitive information in it, that obviously would create a risk of harm for that inmate. But in this case— But the Norman case says that what the man did there wasn't sufficiently analogous to labeling an inmate a snitch as to be a violation. Yes, sir. The allegation. The judge here says there's a fact question as to whether King labeled Reeves a snitch. And our position is that there is not a question of fact as to whether or not he used the word snitch. On a motion for summary judgment, taking the facts— There's not a question of fact as to whether he used the word snitch. Whether he used the word snitch. There's not a question of fact. Taking the allegations and the like, most favorable to Reeves— Oh, you're saying it's accepted that he did use the word snitch. Yes, sir, that he did use the word snitch. That he said, go snitch to the major like you did to him with the nurse. You say that's not labeling him a snitch? Again, the difference is in the context. At 1-11 in the Norman decision, the court said that, and I'll quote, labeling an inmate a snitch informs other prisoners that the inmate has gotten other inmates in trouble. Going down, it says, in contrast, Norman complained about a prison official, not another inmate. Well, but the argument here is that this nurse was funneling contraband to the inmates. And so inmates would be displeased with the fact that Reeves informed on the nurse. And therefore, it's analogous to informing on other inmates. Why isn't that comparable to Irving? That point was brought up in the Norman case. The idea of, well, there are other inmates that participate in this program. They enjoy it. Couldn't you sort of go down the line of reasoning and think that they might get mad if that program was taken away? But the court still held that that's not a constitutional violation. The same applies here. Maybe some inmates could have gotten mad that a nurse from whom they benefited, as far as contraband goes, was discharged. But still, it was just as in the case on October 19, that was reporting on perceived failings of a correctional official. And going to the Williams case, which was, again, that was just a footnote. But it was made clear that there is no authority, at least in November of 2010, in this circuit, that an inmate who reports on correctional officials is at any substantial risk of harm. Well, just to be precise, the footnote in the separate opinion referred to filing grievances or snitching against correctional officers for alleged mistreatment of inmates. In other words, informing that a correctional officer was mistreating inmates is not likely to provoke inmates. Yes, sir. Because they would be sympathetic to discipline against an officer who is mistreating them. Yes, sir. I don't think it's not on point to an allegation about informing on a correctional officer who was facilitating use of contraband by inmates. Well, we would say that given the broad language in Norman and that very precise language in Horner, in October of 2010, if that was a violation, it just was not clearly established such that it would strip the Lieutenant King of qualified immunity. If there are no other questions, I'll reserve the rest of my time for rebuttal. Very well. We'll next hear then from Mr. Donovan. May it please the court. The judgment of the district court should be affirmed. The allegations of Mr. Reeves are that he, in the presence of Lieutenant King, was complaining about not filing grievances properly, and Mr. King, Lieutenant King, in the presence of other inmates, labeled him a snitch. The allegations of Mr. Reeves are sufficient to defeat the claim of qualified immunity because he meets both the objective and the subjective requirements for stating an Eighth Amendment claim. Objectively, was it a sufficiently serious deprivation of his constitutional rights to be labeled a snitch by Lieutenant King? The record reflects that Reeves participated in a sting operation, which resulted in the termination of a prison nurse who was smuggling contraband into inmates. This was the subject of Mr. Reeves' August 20 grievance, where he complained to prison officials that his participation in that sting operation, with the cooperation of prison officials, was resulting in threats and harassment from both inmates and from other correctional officers. I think the court can readily see how the publication of Mr. Reeves' participation in the sting operation resulting in the nurse's termination would incite the anger of inmates who relied on her for contraband and might also incite prison officials with whom she collaborated or who were engaged in similar activities. The threat of retaliation from other inmates is, of course, a serious concern in our prison systems, and that was the underpinning of this court's ruling in Irving v. Normeyer. In that case, let me ask you, you mentioned that the other inmates were already aware of the fact that he had snitched on the nurse. In light of that, is it really objectively serious as required by our deliberate indifference standards? The problem, of course, with this record, Your Honor, is that we don't know the extent to which all inmates knew of his participation in the sting operation. Certainly, he was being threatened by some inmates because of it and filed a grievance about that in August. Whether all inmates knew is unclear and unknown, and I think that's a fact that would have to be developed at trial. Whether the snitch label from Lieutenant King would incite further retribution is another fact inquiry that I think would have to be developed at trial. Perhaps they had calmed down. Perhaps the inmates would be emboldened by reflecting that a prison official was pursuing the snitch label once again. But we don't know who knew and how much they knew. All of those would have to be developed factually at trial. What about the fact that, as I understand the State's argument, the magistrate judge was confused about the timing and was talking about earlier dates before King's statement, August 23, September 7, until the transfer. But as I understand the facts here, we're talking about just one day, right? King makes the statement. Correct, Your Honor. All right. Well, what about whether that's enough to create a substantial risk of harm? I noticed the same thing about the dates. I think that the magistrate's recommendation talked about August through September dates, and the Lieutenant King's statement is in October, and then he's transferred to the East Arkansas unit the day thereafter. The next day, right. So didn't the prison eliminate any substantial risk of harm by moving him the next day? Well, if it is a day, is that serious enough to meet the objective requirement that it's a serious risk of harm? Well, that's the question. And I submit that it is, Your Honor. And you have to base it on the Irving v. Dormeyer case, which analyzed that question. It didn't break it down into a time frame of one day versus a year or anything else, but it analyzed the issue of whether a fear of retaliation from inmates and the psychological and mental stress that that creates is a serious enough harm. And the court specifically distinguished two Seventh Circuit cases which said it wasn't, that you had to have physical harm. But the Irving v. Dormeyer case said no, that the fear of retaliation is a sufficiently serious constitutional deprivation to meet that objective requirement. Now, where do you draw the line between one day or a week? I don't know that you can. I think that is a factual matter, how much he was concerned. But the constitutional principle that the court announced in Irving is that that fear of retaliation is sufficient. Of course, we do not know, after his transfer to the Brickey's East Arkansas unit, whether there was also transfer of inmate population from the Ouachita River unit there, whether other inmates within the Department of Corrections would have known. I don't know, and the record doesn't reflect, but that's to be developed at trial also. Were there records that would be available that would quickly bring that information to the forefront? I think there would be, yes, Your Honor. A matter of just punching it up on the computer and saying, uh-huh, there they are, 26 and all, whatever the number is. I think that could be developed in a trial record. So the ability to obtain it is relatively easy? Is that a fair statement? Well, I don't know what the Department's record keeping is and how readily available that is through electronic determination. I would think it would be, but I don't know. What does the record show about this sort of isolation or segregation in which Reeves was placed during this one day between the statement and the move? The record reflects from Reeves' response to the court's questionnaire and his allegations that despite being in isolation, meaning he wasn't teamed with any other inmate in a cell, other inmates were within earshot. And I think Judge Bryant in his findings reflected on, we don't have enough evidence before us as to whether there was trustee help, whether. Yeah, he said that, but that was in the context of this confusion about the dates. So I wondered if you think that would apply to the one day as well? I think it would. And certainly that's what Reeves alleges, Your Honor, in his complaint, his pro se complaint. He alleges that there were other inmates who could hear what. No, I'm not talking about the earshot. I'm talking about whether he was safe because he was in isolation for that one day. And so there was not a good basis for extreme mental distress because he was in a private cell where no one could harm him. And I wondered if there's enough evidence to suggest that he was at risk. I don't think the record is developed on that point, Your Honor, whether he was at risk and transferring from different areas or not. His allegation is that he had great concern and anxiety for his physical well-being. Whether the record would reflect access by other inmates, I don't know, Your Honor. But if they segregated him and then transferred him, how would that show deliberate indifference? That, I think, gets into the subjective requirement, which is the second one. And I believe that the evidence does show the subjective requirement. I base that on the analysis in Irving, which is that there is no legitimate penological purpose for calling an inmate a snitch. And, in fact, you can infer from that that the subjective state of mind of Lieutenant King was he wanted to publish it so that others knew. So your position is making that statement alone is sufficient even if they do everything they can after that point to try to protect him? Right. You know, Mr. Reeves was in isolation during the period of time that he raised the grievance about I'm being threatened by other inmates and prison officials. How that happens and what the specific facts are about it, I can't tell you. And, of course, I didn't represent Mr. Reeves at the trial court level. So I didn't have the opportunity to develop those facts. The court says that it was unknown whether there were periods of the day when the plaintiff was in company of other inmates, whether inmates cleaned their own cells or trustees were used, etc. Correct. So he seems to think there are unknown facts about whether he really was segregated in a private way all the time. Correct. I think that is the judge's analysis of it based on that factual record presented in the papers, and I think that's correct. Without Mr. Reeves testifying at trial and without Lieutenant King and the ADC officials subject to cross-examination about how the prisoners were fed, how they were moved, who was around, we'll never know. That has to be developed at trial now. The constitutional violation has to be clearly established, right? Correct. So after Norman, how would a reasonable official understand that saying an inmate is snitched on a prison official, how would they know that that necessarily violates the Eighth Amendment? In my view of reading those cases, both Irving and Norman, you cannot call an inmate a snitch.  I mean, that was one of the points in Irving, excuse me, in Norman, that that label was not given by the prison official. So it's my view, based on the strong language in Irving, that if a correctional officer says to an inmate, hey, you're a snitch, and it could lead to retribution from either other correctional officers or inmates, then that's a clearly established constitutional violation. Note that at the time of Irving, the court, there was no established Eighth Circuit precedent on the issue, and the guard in Irving had called the inmate a snitch, and the court said, well, we may not have ruled on this before, but Correctional Officer Briggins, you knew that that was violating the constitutional rights of an inmate to call him that and to make that label. If the court can do that in Irving, then it's clearly established by now here. That case, though, involved snitching on a fellow inmate, right? It did, yes, Your Honor. And here we have a prison official who arguably was providing contraband to others who may now be upset that the snitching, of course, occurred. I'm just wondering if there's a case or something that would have made that obvious to Lieutenant King. That labeling him a snitch about the prison official smuggling in contraband? Correct. I'm not aware of any specific case on that. I think that you have to apply some degree of common sense from Irving, and that is if you label an inmate a snitch in the context in which it might invite retribution from other inmates, then that's a constitutional violation. And any logical-thinking correctional officer, using his common sense, would recognize that labeling an inmate a snitch for having informed on a contraband smuggling prison official would invite that retribution, and I think that's the constitutional analysis of Irving. But your position wouldn't require going all the way to saying labeling an inmate a snitch as to a correctional officer who's mistreating inmates would be a constitutional violation, would it? I think that's a different case, and I recognize that your footnote in the Williams Horner case says that. We don't have that here. Yeah. And whether the context in that case would invite retribution from inmates I think would require specific allegations. But you've got to decide this case. Yeah. And this one, it's clear that that has serious repercussions to the inmate based on who he informed with in the context of the sting operation. Is it undisputed that the nurse was distributing contraband to inmates? Yes. That's why she was terminated. Yes. Were any inmates punished as a result of that? I don't know, Your Honor. I've got 33 seconds left or so. I'll reserve my time. Thank you. You can use it if you'd like, but it's not an absolute requirement of this court to do so. Thank you, Judge Bond. Thank you very much. We will then hear from Mr. Howell. And how many minutes and seconds does Mr. Howell have? Four minutes and 24 seconds, Your Honor. Can you wrap it up in four minutes and 24 seconds? I certainly hope so, Your Honor. All right. First, there towards the end, my friend said that if using the word snitch might incite others to violence, then that meets the constitutional analysis in this case. And that's just not the case. The subjective requirement requires that an officer actually perceives a substantial risk of harm and then chooses to ignore it. And in talking about how there was not a recognized violation before Irving, given the egregiousness of those facts in Irving, this court reasonably found that Officer Moranis was on fair notice, that you can't spend months trying to get other inmates to, as the court said, do your dirty work for you. About the confusion on the dates, the grievance that was not an exhaustive grievance that the district court relied on. It was originally written on August 23rd. And at that time, the inmate, looking in the appendix at page 190, the status assignment sheet or pen pack, as they're often called, shows that at that date the inmate was in 11 barracks. He was not actually in isolation yet, so he was among other inmates. And the substance of that grievance, which is in the appendix at 105, says, I was able to produce some information, which I did, and the results are not so pretty, considering numerous of the inmates are aware of what I did and is pretty upset calling me a snitch. Now, there's nothing in there that says that other guards were angry at Mr. Reeves. Down at the bottom, he says officers informed, suggesting that he had told other people before filing this grievance that he was having some problems. Doesn't that tend to support his claim that what King said was going to trigger retaliation and, in fact, he'd already told several officers that it would do so? No, sir, because he did not actually formalize this grievance until after he filed the complaint. That's the second date that you see at the top, June 8th of 2011. So, Lieutenant King was not on notice of these complaints because Mr. Reeves never actually sent this grievance into the system. What does it mean to be furnished in Step 1? That means, as I alluded to earlier today, that's the very first part of a grievance where you write down your complaint and hand it to somebody who's at least a sergeant. They have two days to get back to you. They give you an informal answer, and if you accept that answer, that's the end of it. The grievance never actually enters into the department's system. Oh, I see. You're just saying it isn't system-wide at that point. Yes, sir. That was a casual conversation between one officer who might have spoken to another. And on another question about how do we know that isolation was reasonably safe for that one day after King's statement. Isolation is the safest and undoubtedly the most restrictive environment that inmates are in in the Department of Correction. They're locked down for at least 23 hours a day. Was that in the record? Was that in the record? Because the judge seems to say, the judge says he doesn't know. He doesn't know whether the periods of the day he's in company with other inmates, whether they clean their own cells and so forth. No, sir. That's not clear from this record. But I'd say that there are several other cases with similar circumstances that the court could take judicial notice of. Well, I don't know about that. And Judge Byer, your question about knowing if other inmates from this unit moved over. The Department of Correction does maintain what they call an enemy alert list or a separation alert list. And before any inmate is moved from one housing assignment, be it a barracks, a cell block, or another unit, there is a cross-check not only of the housing assignment they're going to be in, but whatever their work assignment is, is there a chance that those people might interact. And is that a record that's known beforehand as to who those people are? Absolutely, Your Honor. All an inmate needs to do is report to one of the officials that he has reason to believe that he's in danger from a particular inmate, and he's immediately put in a position where he will not come in contact with that person, and then they begin an investigation and later formalize it. And I'm out of time. If there are no more questions, we would ask that you reverse the denial of qualified immunity in this case. Farewell. I have nothing further to add unless the Court has questions. Thank you for the opportunity. Well, we see people shaking their heads indicating they don't. So you have been spared. All right. Well, we thank you both for your time.